UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

LATIF A. QASSAS,                        )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Case No. 09-CV-0663-CVE-PJC
                                        )
DAYLIGHT DONUT FLOUR                    )
COMPANY, LLC,                           )
                                        )
                    Defendant.          )
v.                                      )
                                        )
AVALON DONUTS INC.,                     )
                                        )
            Counterclaim Defendant.     )

OPINION AND ORDER

Now before the Court are Defendant's Motion for Summary Judgment (Dkt. # 69) and

Plaintiff Latif A. Qassas's Motion for Summary Adjudication (Dkt. ## 77, 78).  Plaintiff Latif A.

Qassas seeks summary judgment on defendant Daylight Donut Flour Company, LLC's (Daylight)

counterclaim of copyright infringement.  Defendant requests summary judgment on its copyright

infringement counterclaim and plaintiff's claims of breach of contract, fraud, tortious interference

with prospective contract and economic advantage, and negligent misrepresentation.

I.

Daylight sells donut ingredients and equipment to domestic and international licensees.

Daylight provides each licensee a protected territory to sell Daylight's products and use Daylight's

trademarks, and the licensee agrees to purchase all equipment and ingredients from Daylight.

International licensees must execute a Master License Agreement ("MLA") before opening an

international store.  Dkt. # 70, Ex. 2, at 1.  The MLA grants the licensee an entire country as his

territory, but the licensee must agree to open at least three additional stores within two years. Id., Ex. 3, at 2. In April 2006, Daylight amended the MLA to require each new licensee to pay a $20,000 training fee for the opening of each international store. Id. at 3.

Qassas approached Daylight in 1998 seeking a license to open stores in Romania on behalf of his company, Pan American Foods. Daylight and Qassas executed an MLA granting Qassas the right to open stores in Romania, but Daylight cancelled the MLA later that year due to Qassas' failure to pay money owed to Daylight. Id., Ex. 1, at 7. Qassas contacted John Bond, the President and CEO of Daylight, in 2006, and sought to establish a business relationship with Daylight. The parties reached an oral agreement for Qassas to work as an international sales representative for Daylight, but no formal contract was executed. Id. at 12. Qassas agreed to locate new international licensees for Daylight and to facilitate the process of entering an MLA with the potential licensee. On April 12, 2006, Bond sent a letter to Qassas memorializing their agreement:

> Upon the sale and collection of moneys for equipment and ingredients you will receive a commission of 20% on the total invoice of equipment and ingredients. Regarding the training fee: When we receive the moneys for the training fee and the training has been completed and the store opened you will be forwarded the training fee. I need for you to take the training course also and be on site and participate in the training of each new store. I can schedule a five day training course for you in Tulsa at your convenience prior to Lebanon opening. There is no cost to you for this.

Dkt. # 70, Ex. 4. Daylight maintains a website providing information for persons interested in entering into an MLA with Daylight, and interested parties can provide their contact information to Daylight and request that a representative of Daylight call them. Daylight received several inquiries from potential international licensees and referred this information to Qassas. However, Bond has submitted an affidavit stating that Daylight did not agree to refer all international contacts to Qassas,

nor did Daylight designate Qassas as the exclusive international agent for Daylight.  Dkt. # 70, Ex. 1, at 18; Id., Ex. 2, at 2.

Qassas testified in his deposition that he understood from Bond that Daylight did agree to refer all international leads to him, and he believed he was the exclusive international marketing agent for Daylight.  Dkt. # 94, Ex. B, at 9.  However, Qassas clarified that Bond did not expressly grant him the exclusive right to pursue all international leads and Qassas did not attempt to clarify with Bond his understanding of the oral contract or letter memorialization.  Id. at 10.  Qassas has produced a different copy of a letter sent by Bond to Qassas and it is also dated April 12, 2006, but the terms of the parties' agreement are identical in both letters.[1]  Dkt. # 94, Ex. A, at 2.  Further, there may have been a misunderstanding as to whether Qassas would be paid a 20% commission on Daylight equipment only or all equipment sold to the international licensee.[2]  Id., Ex. C, at 8.  Qassas also disputes Daylight's argument that the parties' oral agreement did not require Daylight to reimburse Qassas for his expenses when obtaining international leads, but this is not a genuine issue.  Qassas characterizes his training fee and commission as compensation for all of his efforts, and he is not arguing that the parties' agreement entitled him to out-of-pocket expenses in addition to his training fee and commission.  Dkt. # 94, at 8.

---

[1]    There is a formatting discrepancy between the two copies of the letters, but the contents of the letters are identical.

[2]    Qassas also claims that Daylight agreed to pay him a commission upon "shipment" of equipment and ingredients, rather than upon receipt of payment for the equipment and ingredients.  Dkt. # 94, at 7.  He cites his own deposition testimony acknowledging that he was paid a commission for a store in Saudi Arabia that never opened as support for this assertion.  Id., Ex. B, at 12-13.  However, this does not show that Daylight agreed to pay him upon shipment of equipment and ingredients in all instances.

On April 9, 2006, Qassas informed Daylight that he had developed a potential lead for an international licensee in Saudi Arabia. Qassas received support from Daylight's employees when preparing quotes for this lead and other international leads, and Daylight also gave Qassas business cards to distribute to potential international leads. On October 9, 2007, the Saudi Arabian customer submitted an order for ingredients and equipment. Dkt. # 70, Ex. 10. Daylight paid Qassas a 20 percent commission based on the ingredients and equipment ordered by the Saudi Arabian customer. Id., Ex. 11. The Saudi Arabian store never opened.[3] However, Qassas continued to contact the Saudi Arabian customer, and the Saudi Arabian customer asked Daylight to stop Qassas from "bothering us every day." Id., Ex. 12. Daylight informed Qassas that it would handle any further contacts with the Saudi Arabian customer, and it would no longer pay Qassas a commission on equipment and ingredients until a store actually opened. Id., Ex. 2, at 3. Qassas claims that he was not notified of any change to the parties' agreement. See Dkt. # 94, Ex. B, at 19.

In early 2005, Daylight developed a lead for an international store in Beirut, Lebanon, and Bond states that Qassas helped to open the store opened in June 2006. Dkt. # 70, Ex. 2, at 3. Bond states that the store closed "shortly" after it was opened due to the Israel-Hezbollah War. Id. at 3. Qassas sent an e-mail to Bond on September 25, 2007 stating that the Beirut store closed due to the "bad situation in Lebanon," and this seems to confirm Bond's statement. Dkt. # 70, Ex. 13. Daylight has also produced an order submitted by the Lebanese customer on October 16, 2007, and Qassas was paid a 20 percent commission based on this order. Dkt. # 70, Exs. 11, 13. Qassas has produced e-mails between himself and Bond suggesting that the Beirut store opened or reopened in March

---

[3]     Qassas disputes this fact and claims that he is entitled to a $20,000 training fee for the Saudi Arabia store. Dkt. # 94, Ex. B, at 12-13. However, he acknowledges that he did not conduct any training for a store in Saudi Arabia. Id.

2008.  Dkt. # 94, Exs. F, G.  The parties dispute whether Qassas opened the Lebanon store by himself or with the assistance of Daylight employees.  Dkt. # 70, at 10; Dkt. # 94, at 9.  Based on the conflicting evidence, it is unclear when the Beirut store opened and closed and if Qassas provided training to the licensee before the Beirut store opened.

In March 2007, Qassas told Daylight that he was developing a lead for a potential licensee in the United Arab Emirates.  Id., Ex. 16.  The customer did enter into an MLA with Daylight and placed an order for equipment and ingredients.  Daylight paid Qassas a commission based on the equipment and ingredients purchased by the customer, but Qassas claims that Daylight did not pay the full commission of 20 percent.  See Id., Ex. 11 (sales commission report showing that Daylight paid a 20 percent commission to Qassas on three orders but Daylight paid only a ten percent commission for the customer's purchase of Broaster product).  However, the store did not open.  Daylight forwarded information to Qassas about a potential lead in Australia, and Daylight entered into an MLA with a licensee in Australia on March 28, 2007.  Id., Ex. 3, at 6.  Daylight informed Qassas that it would pay him half of the $20,000 training fee, because Qassas was not qualified to conduct training for an automated Belshaw donut making system and it would be necessary to send Daylight employees to Australia to assist Qassas with the training.  Id., Exs. 15, 18.  Qassas claims that Bond did not communicate with Qassas about this change to the parties' agreement.  Dkt. # 94, Ex. B, at 19.  Bond testified in his deposition that he did talk to Qassas and Qassas agreed to the modification of the oral agreement.  Dkt. # 70, Ex. 1, at 17.  The Australia store opened on July 8, 2008, and Daylight paid Qassas a 20 percent commission and a $10,000 training fee.

Qassas developed a new lead for a Daylight store in Portugal around August 2007, and the Portuguese customer signed an agreement with Daylight on September 15, 2007.  Id., Ex. 23.  The

5

Portugal store opened the same week as the Australia store and, as Qassas was in Australia, he could not be present for training in Portugal.  Qassas received a commission for the initial equipment and ingredients purchased by the Portuguese customer, but he did not receive a training fee.  He also claims that Daylight did not pay him commissions for subsequent equipment and ingredients purchased by the Portuguese customer.  At the opening of the Australia store, Qassas asked Daylight to pay his commission and training fee in cash and to refrain from reporting the transaction to the Internal Revenue Service.  Dkt. # 70, Ex. 5, at 17.  Daylight refused to pay Qassas in cash and terminated his agreement to serve as an international marketing agent for Daylight on July 8, 2008.  Id., Ex. 19.  The termination letter does not specifically reference Qassas' request for cash payment.  Daylight assured Qassas that he would receive any money owed under the agreement up to that point, but Daylight made no offer to pay commissions for equipment or ingredients subsequently purchased by customers or training fees for stores that might open in the future.  Id.

After Qassas' relationship with Daylight ended, he formed a company called Avalon Donuts, LLC (Avalon) with the intention of entering the donut business.  Id., Ex. 32, at 4.  Qassas authorized a person identified as "Eduard" to design a website for Avalon, and claims that he had no direct involvement with designing the website.  Id. at 10-11.  Qassas approved the website design and paid a third party to host  the website on the Internet.  Much of Avalon's website is copied directly from Daylight's website and the website represents that Avalon could provide services similar to those offered by Daylight.  See Dkt. # 95, Ex. 13.  However, Qassas admits that Avalon had no facilities to manufacture donut ingredients or equipment, and he had not performed any nutritional testing as represented on the website.  Dkt. # 94, at 6 (plaintiff agrees that defendant's undisputed statements of fact 70 and 75 are not in dispute).  Avalon's website was removed from the Internet between

August and October 2009 due to Qassas' failure to pay the third party's fees.  Dkt. # 70, Ex. 2, at 4; Dkt. # 94, Ex. M, at 17.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review,

7

the Court construes the record in the light most favorable to the party opposing summary judgment. <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Plaintiff seeks summary judgment on defendant's copyright infringement counterclaim, because he did not design Avalon's website and he had no personal knowledge of the contents of the website. Defendant asks the Court to enter summary judgment in its favor on its copyright infringement counterclaim and plaintiff's claims of breach of contract, fraud, intentional interference with contract or prospective economic advantage, and negligent misrepresentation.

### A.

Both parties request summary judgment in their favor on defendant's copyright infringement counterclaim.  Defendant argues that plaintiff created a website for Avalon by directly copying material from Daylight's website, but the material on the website is protected by a copyright. Plaintiff argues that he authorized a third party to create a website, but he did not personally use any copyrighted material when making the website and he had no personal knowledge of the website's contents.

To prove a claim of copyright infringement, a party must show that it possesses a valid copyright and that the infringing party copied protected elements of the copyrighted material.  <u>R.W. Beck, Inc. v. E3 Consulting, LLC</u>, 577 F.3d 1133, 1148 (10th Cir. 2009); <u>Le Resolana Architects, PA v. Reno, Inc.</u>, 555 F.3d 1171, 1177 (10th Cir. 2009).  There is no dispute that defendant has established the first element of a copyright infringement claim.   "A [party's] presentation of a certificate of registration from the U.S. Copyright Office usually constitutes prima facie evidence of a valid copyright and of the facts stated in the certificate."   <u>Palladium Music, Inc. v.</u>

EatSleepMusic, Inc., 398 F.3d 1193, 1196 (10th Cir. 2005).  Daylight has produced a certificate of registration for the "Website for Daylight Donuts (www.daylightdonuts.com)" showing that Daylight has received copyright protection for "text, photograph(s), [and] artwork" on its website. Dkt. # 70, Ex. 30.

Defendant must also show that plaintiff "unlawfully appropriated protected portions of the copyrighted work." Gates Rubber Co. v. Bando Chemical Indus., Ltd., 9 F.3d 823 (10th Cir. 1993). This requires defendant to prove that plaintiff copied portions of the copyrighted material and that the copied elements were "protected expression and of such importance to the copied work that the appropriation is actionable." Le Resolana Architects, 555 F.3d at 1178 (quoting Gates Rubber Co., 9 F.3d at 832).  A copyright holder can indirectly prove copying by showing that the infringing party "had access to the copyrighted work and that there are probative similarities between the copyrighted material and the allegedly copied material." Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280 (10th Cir. 1996).  A copyright holder may prove that the infringing party had access to the copyrighted material by showing that the infringing party had "'a reasonable opportunity to view' or 'opportunity to copy' the allegedly infringed work." Autoskill Inc. v. Nat'l Educational Support Systems, Inc., 994 F.2d 1476, 1490 (10th Cir. 1993).  Substantial similarity between the copyrighted and infringing work is established when "the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the [infringing party] unlawfully appropriated the [copyright holder's] protectible expression by taking materials of substance and value." Jacobsen v. Deseret Book Co., 287 F.3d 936, 943 (10th Cir. 2002) (quoting Country Kids 'N City Slicks, 77 F.3d at 1288).

Daylight has no difficulty proving that Qassas had access to the copyrighted material on its website, because anyone with access to the Internet can access the copyrighted material on Daylight's website.  Green Bullion Financial Servs., LLC v. Money4Gold Holdings, Inc., 639 F. Supp. 2d 1356, 1361 (S.D. Fla. 2009).  Plaintiff does not dispute that he viewed Daylight's website and provided the website address to potential licensees of Daylight.  Dkt. # 70, Ex. 5, at 4, 19.  Qassas had a reasonable opportunity to view Daylight's website, and Daylight has established that plaintiff had access to the copyrighted material.

Daylight has also shown that Avalon's website was substantially similar to the protected material on Daylight's website.  The Tenth Circuit has stated that striking similarity between two works exists when "the proof of similarity in appearance is 'so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded.'" La Resolana Architects, 555 F.3d at 1178 (quoting Corwin v. Walt Disney Co., 475 F.3d 1239, 1253 (11th Cir. 2007)).  Avalon's website contains material that is copied directly from Daylight's website, and there is no possibility that the similarity between the websites is a matter of chance or coincidence.  In fact, plaintiff admits that "'significant' portions of the content of the Daylight website and the Avalon website are 'identical.'" Dkt. # 94, at 15.  The Court has compared Daylight's website to Avalon's website and has found numerous examples of copying:

> In our state-of-the-art dry mix facility, we create the proprietary recipes and mixes for every kind of donut imaginable, as well as a wide variety of other breakfast pastries.
>
> Add to this our own Avalon Donuts-label coffee, a delicious and aromatic medium-roast.  Not only is it available in bulk for use in-store, but it's also offered in 12-oz. packages for carry-out sale.

Importantly, we never let our product mix go stale: We constantly scan markets and food trends for new introductions that will keep the Avalon Donuts product mix fresh, appealing and profitable.

.     .     .

**Do You Qualify?**

It couldn't be easier to find out whether you're a candidate for Avalon Donuts store ownership.  Just review the checklist below? [sic] and don't hesitate to call us if you're uncertain about any requirement.

- The desire and willingness to personally devote full time efforts to operate and manage their own business.
- The understanding of a licensee relationship and the importance of maintaining the integrity of Avalon Donut brand.
- A proven background that highlights a solid employment history and personal financial stability
- Funds available and the ability to borrow additional funds
- An enjoyment of working with the public in a quick-serve environment.

Dkt. # 70, Ex. 8, at 4, 10; Dkt. # 95, Ex. 13, at 2, 3.  The nutritional information about Daylight's products is also copied verbatim on Avalon's website. Dkt. # 70, Ex. 8, at 6; Dkt. # 95, Ex. 13, at 2.  Plaintiff admits that Avalon did not actually have a dry-mix facility or conduct any nutritional testing.  See Dkt. # 94, at 6.  Plaintiff argues that any copying is less significant because Avalon's website simply copied text, rather than artwork, from Daylight's website. Dkt. # 94, at 16.  Plaintiff fails to explain how this makes his copying from Daylight's website any less significant.

Plaintiff argues that he cannot be held liable for copyright infringement because a third party prepared Avalon's website and he had no control over or decision-making authority concerning the content of the website.  This argument is meritless.  The website designer was acting as plaintiff's and Avalon's agent, and the website designer had no independent interest in creating the website.  If plaintiff were correct that copying by an agent is not actionable copyright infringement, any

11

person or business could copy protected material and reap the benefit of their conduct by distancing themselves from the act of copying.  Plaintiff admits that he employed "Eduard" to design a website for Avalon and that plaintiff was the sole owner of Avalon.  These facts are sufficient to show that plaintiff authorized the copying of protected material and stood to benefit from the use of Daylight's copyrighted material.

Daylight does not seek monetary damages for the infringement of its copyright, but requests an injunction preventing plaintiff or Avalon from using copyrighted material on Daylight's website. Dkt. # 70, at 20-21.  Under 17 U.S.C. § 502(a), a federal court is authorized to issue a permanent injunction preventing or restraining the infringement of a copyright.  To obtain an injunction under § 502, a copyright holder must "establish[] past infringement and a substantial likelihood of infringement in the future."  Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1557 (10th Cir. 1996).  If the copyright holder cannot show a probability or threat of continuing copyright infringement, injunctive relief is ordinarily inappropriate.  Id.  In eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006), the Supreme Court was clear that an injunction should not automatically be imposed for every act of copyright infringement.  Id. at 393 ("this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed").  Two federal circuit courts of appeals have determined that eBay requires federal courts to apply the traditional four-part test for issuance of an injunction, rather than a separate standard applied by many courts, including the Tenth Circuit, for enjoining copyright infringement.  Salinger v. Colting, ___ F.3d ___, 2010 WL 1729126 (2d Cir. Apr. 30, 2010); Christopher Phelps & Assoc, LLC v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007).

12

In this case, the Court does not need to decide whether <u>eBay</u> has overruled <u>Harolds Stores</u>, because it would be inappropriate to issue an injunction under the <u>Harolds Stores</u> or traditional test for injunctive relief.[4]  Defendant has not shown that there is a substantial likelihood of future copyright infringement or that it will suffer an irreparable injury unless an injunction is issued. Avalon's website was removed from the Internet between August and October 2009, because plaintiff failed to pay the third party to maintain the website.  Avalon did not actually conduct any business and it is undisputed that Avalon is no longer operating as a business.  Daylight argues that plaintiff has reserved the domain name "www.avalondonuts.com" until September 27, 2011, and he could renew the website at any time by paying the third party's fees.  A hypothetical risk that Avalon's website might become operational in the future is not sufficient to show a substantial likelihood of future copyright infringement or irreparable harm, and the Court will not enter an injunction against plaintiff based only on this hypothetical risk.   Therefore, plaintiff's motion for summary judgment should be granted and defendant's motion for summary judgment should be denied as to defendant's copyright infringement counterclaim.

## B.

Defendant seeks summary judgment on plaintiff's breach of contract claim, and argues that it did not breach the terms of the parties' oral contract and it has paid plaintiff all of the money he was entitled to receive.  Plaintiff responds that the terms of the parties' oral agreement are disputed,

---

[4]     To obtain a permanent injunction under the traditional test, defendant must prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." <u>Prairie Band Potawatomi Nation v. Wagnon</u>, 476 F.3d 818, 822 (10th Cir. 2007).  The only issue in dispute is irreparable harm.

and summary judgment on this claim is precluded by genuine issues of material facts as to the terms of the parties' agreement.

As a general matter, breach of contract is a "material failure of performance of a duty arising under or imposed by agreement." Milroy v. Allstate Ins. Co., 151 P.3d 922, 926 (Okla. Civ. App. 2006) (citations omitted).  To prevail on a claim for breach of contract, a party must prove three elements: (1) existence of a contract; (2) breach of that contract; (3) actual damages suffered as a result of the breach. Oltman Homes Inc. v. Mirkes, 190 P.3d 1182, 1186 (Okla. Civ. App. 2008). If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." Roads West, Inc. v. Austin, 91 P.3d 81, 88 (Okla. Civ. App. 2004).  The interpretation of an unambiguous contract is a question of law for the courts.  Ferrell Const. Co., Inc. v. Russell Creek Coal Co., 645 P.2d 1005, 1007 (Okla. 1982). When the terms of an oral contract are ambiguous, a court may consider evidence outside of the parties' agreement to assist the court in interpreting the oral agreement. See Sooner Broadcasting Co. v. Grotkop, 280 P.2d 457 (Okla. 1955).

The parties dispute the terms of the oral contract, and both parties offer somewhat vague arguments about what they believe the terms of the contract might have been.  It is clear that Daylight authorized Qassas to serve as an international broker or agent when pursuing certain leads for international leads for potential licensees, but the parties dispute whether Qassas was Daylight's exclusive international agent.  Dkt. # 70, Ex. 1, at 18; Dkt. # 94, Ex. B, at 9-10.  Qassas agreed to locate potential international licensees for Daylight.  Daylight forwarded to Qassas contact information of potential licensees that had visited Daylight's website, but Daylight claims that this was not required by the parties' agreement.  Dkt. # 70, Ex. 2, at 2.  Qassas claims that Daylight

14

agreed to forward all international leads to him as part of the agreement. Dkt. # 94, at 9-10. There is no clear evidence that Daylight agreed to pay plaintiff's out-of-pocket expenses incurred in locating new clients, because plaintiff's deposition testimony is equivocal on this point. Dkt. # 94, Ex. B, at 15-18. Plaintiff claims that Daylight agreed to pay him a commission and training fee if his efforts at obtaining an international licensee for Daylight were successful, but he has provided no evidence that Daylight agreed to pay him any additional amount for his expenses.

Bond sent a letter to Qassas on April 12, 2006, and the letter memorializes the parties' prior oral agreement. The letter states that Daylight agreed to pay Qassas a 20 percent commission on "the total invoice of equipment and ingredients," see dkt. # 70, Ex. 4, and Qassas repeatedly states in his response to defendant's motion for summary judgment that this was his understanding of the parties' oral contract. Daylight claims that it later modified the parties' agreement to limit the payment of the commission to the sale of Daylight products only, but Daylight has presented no evidence that Qassas agreed to this modification. Under Oklahoma law, a contract may be modified only by agreement of the parties. Cunningham Lindsey Claims Management, Inc. v. Oklahoam State Ins. Fund, 38 P.3d 248, 252 (Okla. Civ. App. 2001); Boyer v. Boyer, 925 P.2d 82, 85 (Okla. Civ. App. 1996). The letter also states that Daylight agreed to pay Qassas a training fee. However, the letter does not state the amount of the training fee and it does not expressly limit payment of the training fee to circumstances when Qassas actually provides training to new store owners. Daylight claims that Bond later agreed to add a $20,000 training fee after the opening of the Beirut store and Daylight agreed to pay the training fee only when Qassas provided training. It is clear that the training fee was always part of the parties' agreement, and Daylight has provided no evidence that Qassas agreed to the attempted modification of this term of the contract.

15

The Court finds that at least three genuine issues of material fact preclude summary judgment on plaintiff's breach of contract claim.  Viewing the evidence in the light most favorable to plaintiff, plaintiff may be able to show that defendant agreed to make him the exclusive international agent for Daylight.  Plaintiff's deposition testimony provides evidence that he believed the parties agreed to make him Daylight's exclusive international agent, although Bond unequivocally refutes this in his deposition testimony.  See Dkt. # 70, Ex. 1, at 18; Dkt. # 94, Ex. B, at 9-10.  There is also a genuine issue of material of fact as to whether Daylight agreed to pay a 20 percent commission on all equipment and ingredients sold to a customer, or if Daylight agreed to pay this commission only for the sale of equipment and ingredients manufactured by Daylight.  Bond's April 12, 2006 letter states that Daylight would pay "a commission of 20% on the total invoice of equipment and ingredients," and does not expressly limit this commission to Daylight products only.  Dkt. # 70, Ex. 4.  However, Daylight paid plaintiff a ten percent commission for equipment manufactured by a company other than Daylight.  Id., Ex. 11.  There is also conflicting evidence provided by Daylight as to when Daylight was obligated to pay Qassas a training fee, and this is a genuine issue of material fact precluding summary judgment.[5]  Summary judgment on this claim is denied.

## C.

Defendant argues that plaintiff has not produced any evidence that defendant interfered with a contract between plaintiff and a third party, and plaintiff's claims of tortious interference with

---

[5]   The Court does not reach the parties' arguments concerning the availability of post-termination damages under the contract.  However, the Court notes that plaintiff's mere speculation that stores opened after he was terminated will not be sufficient to show that he is entitled to a training fee for stores that allegedly opened after he was terminated.  Daylight has produced evidence that these stores did not open, and Qassas must present evidence at trial to meet his evidentiary burden on this element of his breach of contract claim.

contract and prospective economic advantage fail as a matter of law.  Plaintiff responds that he identified a potential international licensee in China, but defendant wrongfully concealed that it was negotiating with a different Chinese licensee and interfered with plaintiff's solicitation of a potential licensee.  He also argues that Daylight misled plaintiff into believing that he was the exclusive international agent for Daylight, and this constitutes tortious interference with the oral contract between plaintiff and Daylight.

To prove a claim of intentional interference with business or contractual relations, a party must allege: (1) that the party "had a business or contractual right with which there was interference;" (2) "[t]hat the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable;" and (3) "[t]hat damage was proximately sustained as a result of the complained-of interference."  Mac Adjustment, Inc. v. Prop. Loss Res. Bureau, 595 P.2d 427, 428 (Okla. 1979); Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip., 919 P.2d 443, 446 (Okla. Civ. App. 1994); see Dill v. Edmond, 155 F.3d 1193, 1207-08 (10th Cir. 1998).  A claim of tortious or intentional interference with contract may be brought only against a third party to the contract.  Voiles v. Santa Fe Minerals, Inc., 911 P.3d 1205, 1210 (Okla. 1996); Ray v. American Nat'l Bank & Trust Co. of Sapulpa, 894 P.2d 1056, 1060 (Okla. 1994).

Plaintiff misapprehends defendant's argument and he has not shown that defendant interfered with any contract between himself and a third party.  The existence of a potential lead in China does not form the basis for a claim of tortious interference with contract, because plaintiff was performing under his oral agreement with Daylight when soliciting this potential licensee.  Viewed in a light most favorable to plaintiff, defendant may not have honored its agreement with plaintiff, but defendant did not interfere with plaintiff's right to contract a third party.  See Navistar Int'l

17

Transp. Corp., 919 P.2d at 446-447 (noting that the claimant "misapprehend[ed]" the tort of intentional interference with contract, because it alleged only that the opposing party wrongfully terminated an agreement between the contracting parties).  Plaintiff was not attempting to contract with the potential Chinese licensee on his own behalf; he was soliciting a lead for Daylight in his capacity as Daylight's agent.  Plaintiff also argues that defendant did not treat him as its exclusive international agent, and this interfered with plaintiff's right to receive commissions or profits under the parties' agreement.  For the same reasons, this does not constitute tortious interference with contract or prospective economic advantage.  Plaintiff expected payment from defendant under the parties' oral agreement, but he had no expectation of contracting with or receiving any economic benefit from any potential licensees under a separate agreement.  At most, plaintiff's arguments may support his breach of contract claim, but he has not shown that defendant interfered with any contract between plaintiff and a third party.  Thus, defendant is entitled to summary judgment on plaintiff's claim of tortious interference with contract or prospective economic advantage.

### D.

Defendant requests summary judgment on plaintiff's fraud claim, because plaintiff has not identified a material misrepresentation in the parties' oral agreement that plaintiff relied on to his detriment.  Plaintiff claims that defendant misled him into believing that he was defendant's exclusive international agent and that he would be compensated for his efforts to obtain international leads.

Under Oklahoma law, plaintiff must prove by clear and convincing evidence four elements to prevail on a claim of fraud: "(1) a false misrepresentation of a material fact, (2) made as a positive assertion either known to be false or recklessly made without knowledge of the truth, (3) made with

the intention of causing the other party to act, and (4) which is relied on by the other party to his or her own detriment."  Gish v. ECI Servs. of Oklahoma, Inc., 162 P.3d 223, 228 (Okla. Civ. App. 2006).  "Fraud is never presumed and each of the elements must be proved by clear and convincing evidence."  Bourke v. Western Bus. Prods., Inc., 120 P.3d 876, 886 (Okla. Civ. App. 2005).  "[T]he law presumes honesty and fair dealing, and fraud may not be inferred from acts which are consistent with honesty of purpose."  Madill Bank & Trust Co. v. Herrmann, 738 P.2d 567, 571 (Okla. Civ. App. 1987).

Plaintiff has not shown that defendant made a material misrepresentation upon which he relied to his detriment.  Plaintiff asserts that Daylight agreed to make him Daylight's exclusive international agent, but Daylight concealed a potential Chinese lead from him.  However, plaintiff's deposition testimony does not contain any reference to an express representation by Bond that plaintiff would be the exclusive international agent for Daylight or that Daylight was bound to do business with any potential licensee that he presented to Daylight.  Plaintiff's description of the parties' oral agreement is consistent with Bond's April 12, 2006 letter, but plaintiff testified that he received an "indication" from Bond that Daylight would enter an MLA with any person presented by plaintiff.  Dkt. # 94, Ex. B, at 8.  However, plaintiff testified that he did not seek to clarify his status as Daylight's exclusive international agent with Bond or anyone employed by Daylight, but that he assumed that this was the case based on Daylight's practice of referring international leads to him.  Id. at 9-10.  These actions do not constitute a material misrepresentation for a fraud claim.  At most, plaintiff has shown that he interpreted statements or actions by Bond or Daylight employees in a particular way, and acted in accordance with his assumptions.  However, he has the burden to show by clear and convincing evidence that defendant made a material misrepresentation

that caused him  to act to his detriment.  Plaintiff also argues that Daylight represented that the training fee was to compensate plaintiff for his efforts to obtain an international lead, but Daylight refused to pay him  the training fee when a deal fell through with a potential licensee or plaintiff could not conduct the training.  Dkt. # 94, at 28.  This is refuted by the plain language of Bond's April 12, 2006 letter.  Bond wrote that "[w]hen we receive the moneys for the training fee and the training has been completed and the store opened you will be forwarded the training fee."  Dkt. # 70, Ex. 4.  Bond's letter does not reasonably create any inference that the training fee was paid merely to compensate plaintiff for his efforts, but the payment of the training fee to Qassas was dependent on the training fee being paid by the customer and the store actually opening after the training took place.  Plaintiff's belief that the training fee was payment for his efforts was not caused by any representation made by defendant, and this also does not support his fraud claim.

Plaintiff has not shown that there was a material misrepresentation "made as a positive assertion which either known to be false or made recklessly without knowledge of the truth." Bowman v. Presley, 212 P.3d 1210, 1218 (Okla. 2009).  At most, plaintiff has produced evidence that he interpreted certain statements by Bond in a particular way and acted on his assumptions without attempting to clarify allegedly ambiguous terms of the parties' oral agreement.  This is not fraud under Oklahoma law, and defendant is entitled to summary judgment on plaintiff's fraud claim.

## E.

Defendant requests summary judgment on plaintiff's claim of negligent misrepresentation, because there was no material misrepresentation and any attempted modifications to the parties' oral agreement were  communicated  to  plaintiff.    Plaintiff  responds  that  defendant  made

misrepresentations about his status as Daylight's exclusive international agent, and he denies that he agreed to, or even knew about, attempted modifications to the parties' oral agreement.

The Oklahoma Supreme Court has not expressly recognized the tort of negligent misrepresentation, but it has recognized a similar claim of constructive fraud in the field of banking or securities trading.  See MSA Tubular Prods., Inc. v. First Bank & Trust Co., Yale, Oklahoma, 869 F.2d 1422, 1424 (10th Cir. 1989); Lillard v. Stockton, 267 F. Supp. 2d 1081, 1113 (N.D. Okla. 2003); Buford White Lumber Co. Profit Sharing and Sav. Plan & Trust v. Octagon Props., Ltd., 740 F. Supp. 1553, 1562 (W.D. Okla. 1988).  The Tenth Circuit, interpreting Oklahoma law, has stated that a claim of negligent misrepresentation or constructive fraud in this limited context has five elements: (1) a misrepresentation or omission of material fact; (2) the misrepresentation or omission was material; (3) when responding to a credit inquiry, the bank officer failed to exercise reasonable care; (4) the plaintiff reasonably relied on the bank's misrepresentation; and (5) the plaintiff sustained damages by relying on the bank's misrepresentation.  Ragland v. Shattuck Nat'l Bank, 36 F. 3d 983, 911 (10th Cir. 1994).

Even assuming that Oklahoma law would recognize the tort of negligent misrepresentation or constructive fraud outside of the banking or securities trading context, plaintiff has presented no evidence showing that a genuine issue of material exists that requires a jury trial on this claim.  The Court has already determined that defendant did not make a material misrepresentation as to plaintiff's status as Daylight's exclusive international agent or payment of the training fee, and plaintiff offers no new arguments in support of his negligent misrepresentation claim.  Further, as noted in Section III.B, supra, the attempted modifications to the oral agreement were sent to Qassas but he claims he never agreed to them.  The attempted modifications are at issue in the breach of

contract claim, but there is no evidence of a material misrepresentation.  Summary judgment on this claim is appropriate.

      **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 69) is **granted in part** and **denied in part**, and Plaintiff Latif A. Qassas's Motion for Summary Adjudication (Dkt. ## 77, 78) is **granted**.  Defendant's motion for summary judgment is granted as to plaintiff's claims of intentional interference with contract or prospective economic advantage, fraud, and negligent misrepresentation, but denied as to plaintiff's breach of contract claim and defendant's copyright infringement counterclaim.  Plaintiff's motion for summary judgment is granted as to defendant's copyright infringement counterclaim.

      **DATED** this 10th day of June, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT